**CALDER RACE COURSE, Inc. v. METROPOLITAN DADE COUNTY.**
No. 73-1070.
Circuit Court, Dade County.
March 18, 1975.

130

Jeffrey S. Goldman, North Miami, for the plaintiff.

Stuart L. Simon, County Attorney, Alan S. Gold, Assistant County Attorney, for the defendant.

BOYCE F. EZELL, Jr., Circuit Judge.

This matter came to be heard upon the motions for summary judgment of both parties. Prior hereto, the court, by order dated January 31, 1974, denied the motions of both parties for summary judgment on the complaint and answer as originally filed in that there appeared to be genuine issues of material fact. Since that date, the defendant, Metropolitan Dade County, has deposited into the registry of the court, and plaintiff, pursuant to court order, has removed the sum of $69,987.19 which had previously been in issue at the time of the last hearing on the motions for summary judgment. Further, additional pleadings and affidavits have been submitted and this court, under the authority of Unger v. Bergness, 3rd Fla. App. 1965, 172 So.2d 627 and Cahill·v. Cooney, 3rd Fla. App. 1966, 182 So.2d 32, is not precluded from granting a motion for summary judgment because of having denied a previous motion when additional facts are placed in the record.

The court has carefully considered the pleadings, depositions, answers to interrogatories on file, together with the affidavits filed in support of the motions for summary judgment and must conclude that there is no genuine issue as to any material fact and that the defendant, Metropolitan Dade County, is entitled to judgment as a matter of law as to each count of the third amended complaint. In so ruling, the court has determined that the movant, Metropolitan Dade County, has carried its burden of proof by demonstrating conclusively that no real fact issue exists and there is no evidence upon which plaintiff can rely, and that it is entitled to summary judgment as a matter of law. Holl v. Talcott, Fla. 1966, 191 So.2d 40; Harvey Building, Inc. v. Haley, Fla. 1965, 175 So.2d 780; Producers Fertilizer Co. v. Holder, 2d Fla. App. 1968, 208 So.2d 492. In so ruling, the court has not only considered the evidence, such as the pleadings, interrogatories, depositions, affidavits, etc., but has concluded from this evidence that no reasonable inference

would give rise to a disputed material fact issue even though all inferences from the evidence are liberally construed in favor of the plaintiff. See Bermudez v. Jenkins, 3rd Fla. App. 1962, 144 So.2d 859; Graff Enterprises v. Canal Insurance Co., 1st Fla. App. 1968, 213 So.2d 738.

In accordance with the suggestion of the Fourth District Court of Appeal in Reid v. Associated Engineering of Osceola, Inc., 4th Fla. App. 1974, 295 So.2d 125, 127, the court will set forth the basis upon which it is determined that the defendant is entitled to summary judgment as a matter of law. The court does not adjudicate genuine factual issues, but merely identifies those facts upon which the defendant, in the opinion of the court, has sustained its burden of conclusively demonstrating the non-existence of genuine issues of material fact and upon which it is entitled to summary judgment as a matter of law.

1. On July 2, 1969, the defendant, Metropolitan Dade County, filed an application with the Metropolitan Dade County Water and Sewer Board to obtain a certificate of public convenience and necessity for the purpose of furnishing domestic water service and sewer service to certain property owned by the plaintiff, Calder Race Course, Inc. The subject property owned by Calder included the land area for the new summer race course and an adjacent parcel to the east of the race course to be developed as Leisuretown. The application was made with the full support of Calder in that it was believed that the needs of the race track could be most expeditiously served by Dade County. The primary interest of Calder, at the time, was to provide water and sewer service to the race course since the Leisuretown area was dormant without active plans for development.

Attached to the application was an engineering feasibility study entitled "Engineering and Cost Information for Water Supply and Sanitary Sewage to Serve Summer Race Track and Leisuretown Development". The informational report was dated June, 1969, and was prepared by the Dade County Public Works Department, Water and Sewer Division as a feasibility study pertaining to water and sewer service for both the race track and Leisuretown. Paragraph 5 of the report, entitled "Financing", specifically sets forth that the allocation of cost was based on "previous discussions" between representatives of the property owners and Dade County. The paragraph states that Dade County "will be responsible for engineering and construction of off-site water mains". According to paragraph 4 (Table 2) of the report, the anticipated cost for off-site water (exclusive of contingent costs) was $41,400. The report also envisioned that the county would purchase water from the city of North Miami Beach under a contract to be negotiated. At the time of the application there was correspondence and gen-

eral agreement between Dade County and the city of North Miami Beach that the agreement would be consummated.

2. On July 28, 1969, the Dade County Water and Sewer Board issued Order No. 69-38, which unconditionally approved Dade County's application and awarded a certificate of public convenience and necessity for the extension of water and sewer service to Leisuretown and the race track.

3. At the time of the application, and up through and until July 31, 1970, the effective date of Ordinance No. 70-60, Rules 18-21 of the Water Main Extension Policy of the Dade County Water and Sewer Board were applicable to the parties.

4. On June 10, 1970, representatives of Calder and the county met to discuss the terms upon which domestic water service would be furnished to the property. Among those present were Joseph A. Benner, Jr., special representative of Stephen Calder, Stefan H. Zachar, architect for Calder Race Course, George Seiler, consultant engineer for Calder, Garland Budd, attorney for Calder, and Dennis Carter, special assistant to the county manager. At the meeting, Calder's engineer, George Seiler, presented a document disclosing two alternative methods for extending water service to Calder Race Course. Under Alternative I, an eight inch water line consisting of 4,600 linear feet would be installed from N. W. 196th Terrace, along 22nd Avenue, to a terminal point at the edge of the race course property. The installation of the eight inch water line would satisfy Calder's domestic water requirements but would not provide adequate fire flows at required pressures. Consequently, fire fighting equipment including fire pumps and a ground storage tank would have to be installed on the race track property. Northwest 196th Terrace was chosen as the initial connection point under Alternative I because the city of North Miami Beach had an existing eight inch water line and capacity at that point. Pursuant to George Seiler's cost calculations, which were based on his knowledge of competitve bid prices at the time, it was estimated that under Alternative I the installation of the domestic water pipe would cost $58,320 and the additional fire fighting equipment would cost $110,160, for a total cost of $168,480.

Under Alternative II, the race course would be served with a sixteen inch, as compared to an eight inch, water main which would extend from Miami Gardens Drive, the existing city of North Miami Beach fire main, to a terminal point at the outer edge of the Calder property. By this alternative, the total cost would be $189,312 as compared to $168,480 under Alternative I.

The Seiler document was prepared for the meeting to give the Calder representatives a choice of fire fighting alternatives at comparative costs. At the meeting Mr. Seiler recommended Alterna-

tive II. In his opinion, it offered, through its greater flow and pressure, more dependability for fire fighting and would eliminate the installation of fire fighting equipment on the Calder property. Furthermore, with a sixteen inch line, Calder would have increased capacity in the future for Leisuretown, as it developed, to tie into the system.

5. The parties, at the June 10th meeting, agreed that the county would pay $58,320, the cost of bringing an eight inch line for domestic water service from N. W. 196th Terrace to the race track property, and that Calder would install the water line and make its own decision as far as the fire fighting facility under Alternative I or Alternative II. As a result of the arrangement, the Calder track was to be charged a monthly water service charge at no profit to the county; that is to say, that the county was to charge Calder for water the same amount that it would have to pay to the city of North Miami Beach on a wholesale basis as a result of the proposed volume sales contract.

6. On June 20, 1970, Mr. Dennis I. Carter, as a special assistant to the county manager, wrote to Mr. Stefan H. Zachar, architect for Calder Race Course, in confirmation of the meeting of June 10, 1970. This letter sets forth Mr. Carter's understanding of the agreement of the parties at the June 10, 1970 meeting. In essence, the letter provides as follows —

> It was further agreed that Dade County would participate in the cost of an 8″ off-site water transmission line which will serve the domestic requirements of the race track, but which will not provide for the fire flows at required pressures. This 8″ cast iron pipe will be constructed at county expense for a distance of approximately 4,600 linear feet and is estimated to cost $48,600 plus $9,720 for engineering costs and contingencies for a total project cost of $58,320.
>
> Calder Race Track will have the option to either (a) provide on-site water storage and pumping equipment for fire fighting purposes, costing approximately $110,160, or (b) construct a 16″ cast iron water transmission line of 9,100 linear feet at a total cost of $189,312, including engineering fees and contingencies, of which Dade County would pay the cost of the 8″ water main for domestic requirements costing approximately $58,320, which would leave the developer paying the difference of approximately $131,000. This additional cost to the developer for the off-site water transmission line is to provide for the adequate flows and pressures for fire fighting purposes to serve the race track's needs, but for which Dade County will receive no monthly service charge unless a fire occurs and water is used.
>
> If these conditions are satisfactory to the developers of the Calder Race Track, it will be appreciated if you will so indicate by return mail so that this matter may be presented to the Board of County Commissioners for final authorization to proceed.

On June 26, 1970, Mr. Garland M. Budd, on behalf of Calder, elected to utilize Alternative II and requested that the county agree to prorate the cost of any contribution with respect to the sixteen inch water line in the event that some other user connects thereto. The letter provided in material part as follows —

> Your letter seems to reflect quite clearly the agreements reached at our meeting of June 10, 1970. However, you make no mention of the proration contract with respect to the 16" water line in the event some other user connects with it.
>
> We intend to pay for a 16" cast iron water transmission line as per your letter and would like to have an expression from you that the county would see to it that anyone connecting with it later on would be required to make a pro-rata cost contribution to us.

7. On June 30, 1970, Mr. Carter, by letter to Garland M. Budd, acknowledged receipt of the letter of June 26, 1970, and thereby confirmed earlier discussions to the effect that Calder would be reimbursed on a pro-rata basis in accordance with the Metropolitan Dade County's Sewer Extension Policy, for funds collected by Dade County from other users of the sixteen inch water force main to be constructed by Calder. The letter provided in pertinent part as follows —

> I am writing you this letter to confirm our previous discussions that your client, Calder Race Course, Inc., will be reimbursed on a pro-rata basis, in accordance with Metropolitan Dade County's sewer extension policy, for funds collected by Dade County from other users of the 16" water force main to be constructed by your client.

8. On July 24, 1970, the board of county commissioners passed and adopted Resolution No. R-884-70, which authorized payment of the sum of $58,320 by Dade County to Calder subsequent to and contingent upon Dade County and the city of North Miami Beach having entered into a contract whereby the city of North Miami Beach would furnish water and sewer services to the certificated area on a volume basis. Attached to the resolution is a memorandum of Hoke Welch, assistant county manager, to Thomas C. Britton, county attorney, requesting the preparation of such a resolution. By letter dated August 13, 1970, a copy of the resolution was sent to Stefan Zacher by Dennis Carter.

9. On July 21, 1970, the board of county commissioners enacted Ordinance No. 70-60, whereby Dade County was removed from the jurisdiction of the Metropolitan Dade County Water and Sewer Board. The effective date of this ordinance was July 31, 1970.

10. In accordance with Calder's election to install the sixteen inch water line along N. W. 22nd Avenue from the race track due

south to Miami Gardens Drive, Mr. Seiler, on behalf of his firm, Reynolds, Smith & Hill, prepared complete engineering drawings and specifications which were signed on July 2, 1970. Thereafter, Calder, through its contractor, placed water pipes along the proposed N. W. 22nd Avenue route, although no such pipe was installed in the ground physically.

11. During the period between July and December, 1970, both the county and Calder attempted to obtain the easements along N. W. 22nd Avenue from the Morton family. The easements were to be conveyed in favor of the county so that it could own, maintain and operate the system. Several easements were in fact obtained from the Morton family but were later cancelled and rescinded.

12. When it became apparent in late 1970 that the Morton family would not grant the easements without compensation, the county informed Calder either to agree to compensate the owners of the easements or in the alternative follow another route. To this effect, on December 15, 1970, Mr. Carter wrote to Mr. Joseph Benner, Jr., Calder's representative, as follows —

> As you are aware, Metropolitan Dade County is responsible for providing water and sewer service to the Calder Racetrack upon its opening in May 1971. You are also aware, however, that it is the responsibility of Calder Racetrack to provide Dade County with all necessary easements necessary for the furnishing of this water and sewer supply which are not already available as a matter of public right-of-way. We have been planning to provide you with water and sewer service through the construction of off-site water and sewer transmission mains from the racetrack through an easement to be provided by the developer, along theoretical N.W. 22nd Avenue.
>
> Inasmuch as time is now becoming critical, and we have not yet received the appropriate easements within theoretical N.W. 22nd Avenue, it is the recommendation of this office that your immediate consideration be given to the following alternate routes for the water and sewer facilities along presently available and dedicated rights-of-way.
>
> *     *     *     *
>
> Water Service: It is proposed that a water main be constructed from the racetrack easterly along the canal right-of-way to N. W. 7th Avenue and then southerly for a distance of approximately 300 feet to connect to a 16″ water main.
>
> Because time is so important to the scheduled opening of your racetrack, please give serious and immediate consideration to the above suggested alternate routes for the off-site water and sewer facilities to serve the racetrack. Your interest and cooperation in this project is most appreciated.

13. On January 13th, Calder, having to provide water service for a scheduled May, 1971, opening date, elected to proceed with an alternate route. The new alternate route connected with a sixteen inch city of North Miami Beach water main, then proceeded north, then west along the south right-of-way of the Snake Creek Canal to N. W. 22nd Avenue right-of-way, and thence north to the race track property line. The record discloses that the initial point of connection was chosen because it was the first and closest point that adequate water source could be obtained for fire protection. Following the preparation of plans and specifications therefor, the pipe previously distributed on N. W. 22nd Avenue between N. W. 183rd Street and 196th Street was redistributed along the new route. The easements along the right-of-way belong to both the county and the state. The county assisted Calder in obtaining the state right-of-way easement. The record also shows that there was a point along the new route where connection to the city of North Miami Beach's eight inch water line could have occurred if Calder had elected to install the same.

14. On May 18, 1971, the board of county commissioners passed and adopted Resolution No. R-726-71 which approved three contracts between Dade County and the city of North Miami Beach providing for sewage disposal service for the race track and also for the sale of water by the city to the county for resale in the race track area by the county.

15. In the opinion of the court, defendant has conclusively demonstrated that no pre-existing contract or agreement establishing Dade County's responsibility for off-site water mains had ever been approved or adopted by the board of county commissioners prior to the passage of Resolution No. R-884-70. Pursuant to Article I, §1.01(A) of the Home Rule Charter for Metropolitan Dade County the board of county commissioners is the legislative and governing body of the county and, pursuant to §4.03(C), may only obligate the expenditure of money from the county treasury under a prescribed manner and method. Clearly, public funds may not be prejudiced or impaired by agreements which ignore regulations adopted for the protection of such funds. See Purdy v. Covert, 2d Fla. App. 1963, 151 So.2d 891. Otherwise, a "give-a-way" of public funds might result. Thus, even if plaintiff did establish a genuine factual issue (which it has not) that the agents of the county had actually entered into a pre-existing agreement, that would be *ultra vires* and beyond their authority. As noted in Town of Madison v. Newsome, 39 Fla. 149, 22 So. 270, one dealing with the officers of a municipality is bound at his peril to take notice of the limitations upon their power and authority. See also Brown v. City of St. Petersburg, 11 Fla. 718, 153 So. 141; Ramsey v. City of Kissimmee, 139 Fla. 107, 190 So. 474.

16. Further, that defendant has conclusively demonstrated that the burden and responsibility of obtaining easements along the original route where the off-site water mains were to be laid was on the plaintiff. Pursuant to Rule 18, subpart A of the Water Main Extension Policy, the burden was upon the applicant to provide without cost to the utility any right-of-way easements required to furnish the service requested by the applicant. The use of the word "applicant" in the context of the rules conclusively refers to that party which is to be furnished service by the utility. No agreement or contract, approved in accordance with law (see paragraph 15 above), varied or changed this obligation. Mere inconvenience or cost of compliance though they might make a hardship, cannot excuse plaintiff or shift the burden and risk of non-compliance to the defendant. See generally, City of Tampa v. City of Port Tampa, 2d Fla. App. 1961, 127 So.2d 119; Bumby & Stimpson, Inc. v. Peninsula Utilities Corp., 3rd Fla. App. 1964, 169 So.2d 499; Metropolitan Dade County v. Babcock Co., 3rd Fla. App. 1973, 287 So.2d 139; 13 Am. Jur., *Contracts,* §406. Plaintiff has failed to come forward with counterevidence or justifiable inferences from the facts presented, other than a recitation in its affidavits of conclusionary allegations initially set forth in the pleadings sufficient to reveal a genuine factual issue with regard hereto.

17. Moreover, the defendant has conclusively demonstrated that the agreement of the parties as approved by Resolution No. R-884-70 of the board of county commissioners was based upon real and substantial consideration and was in conformity with, and not violative of, the terms and conditions prescribed by the rules approved by the board of county commissioners applicable thereto. Such agreement was predicated upon a choice of alternatives proposed by the plaintiff's own engineer and was formalized by letters of representatives of the parties dated June 20, 1970, June 26, 1970, and June 30, 1970, and finally approved by the board of county commissioners on July 24, 1970. The amount of $48,600 (plus $9,720 for engineering costs and contingencies) as the county's contribution to the water main extension, conforms to the projected expenditure for off-site water mains reflected in the feasibility report which, in plaintiff's view, embodies the agreement of the parties as approved by the water and sewer board.

18. Finally, that defendant has conclusively demonstrated that plaintiff's claim of duress is without basis in fact or law. Taking all inferences in favor of plaintiff, duress is not established merely by showing that consent was secured by the pressure of financial necessity or circumstances of the person seeking to assert it. In the opinion of this court, Dade County has successfully met the

burden of proving the absence of a genuine issue of material fact as to duress, and has conclusively shown that the relationship between Dade County and Calder was one of cooperation and fair dealing, and Calder has not come forward with evidence sufficient to generate an issue of material fact on this point. It is not sufficient to avoid a summary judgment to merely assert a position on a question of fact, as plaintiff has done by conclusionary statements of fact and law contained in its affidavits, without evidence to support that position in the face of substantial evidence to the contrary. See Jones v. Hartford Accident & Indemnity Co., 1st Fla. App. 1959, 109 So.2d 582.

Wherefore, it is ordered —

1. The defendant's motion for summary judgment is granted as to each count of the third amended complaint.

2. Summary judgment is entered as to each count of the third amended complaint, and the cause is dismissed with prejudice.

3. Plaintiff's motion for summary judgment is denied, and defendant's motion for judgment on the pleadings is denied in light of the court's ruling on summary judgment.

4. Plaintiff shall take nothing by this action (other than the amount deposited and withdrawn from the registry of the court) and defendant shall go hence without day.

5. Costs, to be determined at a later date, shall be assessed against the plaintiff.

6. This court shall retain jurisdiction of this cause for the purpose of enforcing the provisions of this order.